(No. 11016.—Reversed and remanded.)

THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.* THE
CHICAGO TITLE AND TRUST COMPANY, Appellee.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*

1. FREEHOLD—*a freehold is involved if its existence is in issue
by the pleadings.* A freehold is involved not only where one party
will gain and another lose a freehold by the decree, but whenever
the existence of a freehold is put in issue by the pleadings and
must be decided.

2. DEEDS—*forfeiture is the only remedy for breach of conditions
subsequent.* The acceptance of a deed poll by a grantee convey-
ing land and containing covenants to be performed by him, fol-
lowed by his entering into possession, binds him to the performance
of the covenants the same as if he had signed the deed, and the
grantor may recover for breach of the covenants; but where there
are no agreements or covenants but merely conditions subsequent,
the only remedy for a breach of the conditions is a forfeiture of
the estate conveyed and its re-investment in the grantor.

3. SAME—*court cannot decree specific performance of condition
subsequent.* A condition subsequent in a deed differs from a cove-
nant in that a breach of the covenant calls for a recovery in dam-
ages while a breach of a condition works a forfeiture of the estate,
and while the court, in a proper case, may specifically enforce a
covenant it cannot compel the performance of a condition in a
deed the breach of which works a forfeiture of the estate.

4. SAME—*when condition in a deed will not be construed to be
a covenant.* In case of doubt as to whether a provision in a deed
is a condition subsequent or a covenant it will be construed to be
a covenant to prevent the destruction of the estate, but where the
provision contains an express stipulation for the forfeiture of the
estate in case of a breach and its immediate vesting in the grantor
there can be no doubt that the parties intended to create a condi-
tion subsequent.

5. SAME—*when equity will relieve against the consequences of
a breach of condition.* Equity will relieve against the consequences
of a breach of condition and save from forfeiture an estate which
has vested and is in danger of being defeated by a failure to per-
form a condition subsequent, when the breach was not willful, when
the injury can be adequately compensated in damages and when
there is a certain rule by which to measure the damages.

6. SAME—*where right to a forfeiture for breach of condition is
waived, equity may enjoin suit in ejectment by the grantor.* The

278 — 34

grantor may waive the right to a forfeiture for breach of a condition subsequent in a deed, and when such right is once waived it cannot be revived by a change of mind or by subsequent events, and in such case a court of equity may enjoin a suit in ejectment by the grantor to recover the land.

7. SAME—*waiver of forfeiture for breach of condition may be by parol.* The waiver of a forfeiture for breach of a condition in a deed may be by parol even though the instrument is under seal, and where the grantor does any act inconsistent with his reliance on the condition his act amounts to a waiver of the condition so as to preclude him from afterward availing himself of the forfeiture.

APPEAL from the Circuit Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding.

EDMUND D. ADCOCK, (WILLIAM C. ASAY, ALFRED F. TOMPKINS, and LEO SPITZ, of counsel,) for appellant.

ANDREW R. SHERIFF, (HORACE KENT TENNEY, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Sanitary District of Chicago filed a bill in the circuit court of Cook county against the Chicago Title and Trust Company to restrain the prosecution of an action of ejectment and an action of trespass on the case in the superior court of Cook county and an action of assumpsit in the municipal court of Chicago, all brought by the trust company against the sanitary district. The trust company appeared, answered the bill and filed a cross-bill, which was answered. Replications were filed, and after a reference to a master the cause was heard and a decree was rendered ordering the sanitary district to pay to the trust company $46,993.53 and $3831.12 master's fees, and that upon such payments being made the trust company be perpetually restrained from further prosecuting the three actions at law. The complainant appealed from the decree and the defendant has assigned cross-errors.

The controversy grew out of the construction by the appellant of a new channel for the north branch of the Chicago river as an adjunct to the main channel of the Sanitary District of Chicago. Prior to the year 1899 a voluntary company known as the Northwest Land Association contracted for the purchase of 400 acres of land in the city of Chicago situated about six miles northwest of the court house, between Lawrence avenue and Montrose avenue, which were the boundaries of the tract on the north and south, respectively, and Western avenue and Kimball avenue, which were the boundaries on the east and west, respectively. On June 19, 1899, the title to this land was conveyed to the Title Guaranty and Trust Company as trustee for the members of the Northwest Land Association, who were holding it as an investment, in the expectation of profits to be derived from its development and increase in value. By consolidation the Chicago Title and Trust Company has become the successor of the Title Guaranty and Trust Company. The tract was to a large extent in its natural condition. The north branch of the Chicago river ran across the east part of it. This was a winding stream, which at certain seasons of the year contained very little water and at others overflowed its banks, covering a flat area of about 32 acres on either side of its tortuous course. The question of drainage and of controlling the waters of this stream and straightening its channel was a serious one, and from the time of the conveyance to the trust company to and through the summer of 1903 the owners were in negotiation with the city of Chicago and the sanitary district upon the subject. The owners of the tract were desirous of securing drainage for their land and the sanitary district desired to construct an adjunct for the main channel of the district and for this purpose to use and straighten the channel of the north branch of the Chicago river. This proposed channel was several miles long, running south from Lawrence avenue across the tract of land in question to the

main channel of the Chicago river at Lake street, and was originally planned to be eighty feet wide and eight feet deep, though it was afterward made larger and constructed ninety feet wide and twelve feet deep. The negotiations were carried on between the sanitary district and Wyllys W. Baird, representing the owners of the land, and finally resulted in an offer on his part to give a strip of land one hundred and eighty feet wide from Montrose avenue to Lawrence avenue for the construction of the new channel for the north branch of the river, and a deed dated July 22, 1903, though not executed until October 27, 1903, was made conveying this strip of land, containing 13.7 acres, to the sanitary district. After reciting the desire of the sanitary district to construct and maintain the new channel of the north branch of the Chicago river as an adjunct to the main channel of the Sanitary District of Chicago, and the belief of the trust company that the construction and maintenance of the new channel would be a benefit to its lands in the vicinity as well as a benefit to the public at large, and the desire of the trust company to assist in promoting the work by donating and conveying to the sanitary district the land therein described, the deed conveyed to the sanitary district the strip of land one hundred and eighty feet wide from Montrose avenue to Lawrence avenue "solely for the purpose of said proposed new channel and subject to and upon the following express conditions, to-wit:" Then followed a number of conditions, the first three of which are substantially as follows, so far as material to this controversy:

1. That the district shall construct, excavate and complete said proposed new channel of the dimensions specified in section 2 and shall cause the waters of the Chicago river to permanently pass through the same within three years from the date of the deed, and shall construct said channel of the dimensions mentioned in section 2 through the above property within two years from and after the date of the deed.

2. The district shall construct and maintain the proposed new channel so that the same shall not be less than eighty feet in width, and shall have a constant flow of water not less than eight feet in depth for the whole width of said eighty feet.

3. That all material which shall be taken and excavated from the proposed new channel shall by the district, at its expense, be placed or deposited in the old channel of the north branch of the Chicago river or upon premises contiguous to such part of the old channel, as may be directed by the owner or owners of such contiguous premises.

There were eight other paragraphs containing conditions and restrictions in regard to the land, followed by this paragraph: "This deed is made on the express condition that the party of the second part, or its successors, shall faithfully perform each and all of the conditions herein contained on its part to be performed, and any neglect or failure so to do shall forfeit the estate hereby conveyed, and in such case this conveyance shall be null and void and the estate hereby conveyed shall revert to and immediately vest in the party of the first part, its successors and assigns."

The deed provided that it should be of no effect until accepted by the sanitary district by the formal action of its board of trustees and until notice in writing of such acceptance should have been given to the grantor. It was accepted by the sanitary district by formal action of its board of trustees on November 4, 1903, and the grantor was notified in writing of such acceptance on November 20, 1903.

The sanitary district entered into a contract for excavating the channel and on May 10, 1904, began the work of excavation, depositing the excavated material in the old river channel, as required by the deed. This work continued until October 5, when it was stopped on account of the inability of the contractors to proceed with their outfit, which was adapted only for excavating by the dry method. About one-tenth of the total amount of material to be ex-

cavated had then been removed and placed upon the other lands of the appellee. In view of the condition of the material to be excavated, as disclosed after the work had progressed for some time, the appellant's engineers did not regard the dry method of excavation as feasible. Thereupon the contractors, with the consent of the appellant, assigned their contract to the Chicago and Great Lakes Dredge and Dock Company, which had adequate equipment for doing the work with hydraulic and dipper dredges, and the remainder of the work was done by that company and that method. No further work was done, however, on the section of the channel through the appellee's land until June 12, 1906, long after the two years had expired within which the conditions of the deed required the channel to be constructed. At that time the Chicago and Great Lakes Dredge and Dock Company, which had previously been engaged upon the lower section of the channel, reached the appellee's land and began work on that portion of the channel, and it was not until August 13, 1907, that the waters of the north branch of the Chicago river were turned into the new channel and permanently passed through it.

In excavating with hydraulic dredges the excavated material, earth and water, was pumped through conveyors to the place of deposit, with the result that the land was flooded with mud and water. All the excavated material, however, was not placed on the appellee's land but large quantities were hauled away in scows and deposited elsewhere. On April 15, 1907, the appellee served notice on the appellant that it would hold the appellant responsible for all damages occasioned by the breach of the covenants and agreements contained in the deed of July 22, 1903, and also that default had been made in the performance of the covenants in that deed in that the channel had not been completed within two years, and that unless the appellant completed the channel and caused the waters to permanently pass through it on or before July 1, 1907, the appellee would

declare the estate conveyed to be forfeited. On January 20, 1909, the appellee took possession of the ground adjacent to the main channel and posted signs reading, "Private property of trust company, trustee." On January 22, 1909, the appellee began its action in ejectment to recover the possession of the one hundred and eighty foot strip through the land and an action of trespass on the case to recover for damages caused by overflowing the appellee's land and delay in constructing the channel, and on April 13, 1909, an action of assumpsit for damages occasioned by the failure to place all the excavated material upon the appellee's land. The bill to enjoin the prosecution of these suits was filed on May 12, 1910.

The circuit court found that the appellant had failed to comply with the terms of the deed and did not construct the channel through the appellee's land within two years and did not deposit in the old channel or the contiguous premises all the excavated material, but it further found that the terms of the deed in regard to the time of completion of the channel and the deposit of the excavated material were conditions subsequent, and that for the failure to perform them the appellee could not recover damages, but that by reason of such failure the estate conveyed by the deed became liable to forfeiture and the appellee became entitled to have the title to and possession of the land restored to it, except as such restoration was prevented by reason of the dedication, operation and use of the land for public purposes; that by reason of such dedication, operation and use it was impossible to restore the land to the appellee, and the appellee was therefore entitled to recover the value of the land on the day it began its action of ejectment, together with five per cent interest thereon, amounting to $46,993.53.

The master in his report found the amount of excavated material which the appellant failed to deposit on the land and ascertained its value to be $38,505, and found that 116

acres lying east of the channel were affected by the delay and flooding, and that the measure of damages was interest for the period of such delay on what the land would have been worth on July 22, 1905, with the channel completed, which was found to be $27,053, and a decree for $65,558, the amount of these two items, in favor of the appellee, was recommended.

The appellee contends that the master's report was right in principle, but that he under-estimated the amount of the damages by reason of the failure to deposit the excavated material; that the court erred in holding the provisions of the deed to be conditions subsequent and in the principle applied in fixing damages, and that the decree in its favor is for too small a sum. The appellant insists that the court erred in not dismissing the appellee's cross-bill for want of equity and in entering a decree for any amount against it.

Though no motion was made to dismiss the appeal, the appellee's brief suggests a doubt of our jurisdiction of the appeal by the sanitary district. Attention is called to the fact that the original bill is for an injunction, only, against the prosecution of the suits at law, and that the cross-bill does not pray for a forfeiture but asks for damages, only. The bill sets up the deed to appellant, the bringing of the suits against it, and facts which are claimed to constitute a waiver of the right to declare a forfeiture or estoppel to its exercise, and to constitute equitable defenses which can not be availed of in the actions at law. The cross-bill avers the forfeiture of the estate and re-entry by the grantor, avers that by reason of the appropriation of the land to public uses it cannot be restored to the appellee, and asks for damages for its right to have the land conveyed by the deed forfeited and restored to it. The answer to the cross-bill denies the breach of the conditions and denies the forfeiture of the estate. The decree finds a breach of the conditions and a forfeiture of the estate, that the appellee can not be restored to the possession of the land, and for that

reason awards damages. A freehold is involved not only where one party will gain and another lose a freehold by the decree, but whenever the existence of a freehold is put in issue by the pleadings and must be decided. Such is the case here, and the appeal was properly brought to this court.

The rights of the parties must be determined by the deed of July 22, 1903, to the sanitary district. That instrument is a deed poll conveying the land described solely for the purpose of the proposed new channel upon conditions subsequent. The effect of it was to vest the title in the appellant until condition broken, as completely as if the conveyance had been absolute. The appellee retained no estate in the land and had no more than a possibility of reverter,— the bare right of entry in case of the breach of a condition. If the appellant had done none of the things mentioned in the conditions, the only liability incurred would have been the forfeiture of the estate. The acceptance by the grantee of a deed poll conveying an estate in land and containing covenants or agreements to be performed by the grantee, followed by his entering into possession of the premises, binds the grantee to the performance of the covenants or agreements as effectually as if he had signed the deed. (*Dean* v. *Walker*, 107 Ill. 540; *Schmidt* v. *Glade*, 126 id. 485; *Sanitary District of Chicago* v. *Martin*, 227 id. 260; *Druecker* v. *McLaughlin*, 235 id. 367; *Midland Railway Co.* v. *Fisher*, 125 Ind. 19; *Sexauer* v. *Wilson*, 136 Iowa, 357; *Burbank* v. *Pillsbury*, 48 N. H. 475; *Atlantic Dock Co.* v. *Leavitt*, 50 Barb. 135; 54 N. Y. 35; *Atlanta, Knoxville and Northern Railway Co.* v. *McKinney*, 124 Ga. 929; *Hickey* v. *Lake Shore and Michigan Southern Railway Co.* 51 Ohio St. 40.) In the present case, however, there was no covenant or agreement on the part of the grantee to do anything. The grant was upon condition that the grantee should do several things, though the instrument contained no agreement to do them but declared that any neglect or failure to perform should forfeit the estate, and in such

case the conveyance should be void and the estate conveyed should revert to and immediately vest in the grantor. The appellee had a right to make the conveyance on such lawful terms as it saw fit, and both parties have the right to have it enforced according to its terms. Besides the condition for the construction of a channel of certain dimensions within a certain time the appellee might have inserted an agreement by the grantee to construct a channel according to those terms, and if the appellant had accepted a deed containing such an agreement and entered into possession under it the appellant would have been bound to construct the channel accordingly. In the absence of such agreement the appellee's only remedy for a breach of the condition is that for which it stipulated in the deed,—a forfeiture of the estate conveyed and its re-investment in the appellee. "A condition differs from a covenant. The legal responsibility for non-fulfillment of a covenant is that the party violating it must respond in damages. The consequence of the non-fulfillment of a condition is a forfeiture of the estate. The grantor may re-enter and possess himself of his former estate. The court, in a proper case, can enforce the specific performance of a covenant but it cannot enforce the specific performance of that in a deed the non-performance of which works a forfeiture of the estate." (*Woodruff* v. *Woodruff,* 44 N. J. Eq. 349; *Woodruff* v. *Trenton Water Power Co.* 10 id. 489; *Sharon Iron Co.* v. *City of Erie,* 41 Pa. 341; *Underhill* v. *Saratoga and Washington Railroad Co.* 20 Barb. 455; Devlin on Deeds, sec. 970.) In case of doubt as to whether a provision in a deed is a condition or a covenant it will be construed to be a covenant to prevent the destruction of the estate, but here the express stipulation for the forfeiture of the estate and its immediately vesting in the grantor removes all doubt as to the intention of the parties to create a condition subsequent.

Deeds have been made conveying land to railroad companies upon condition that a railroad station should be es-

tablished and- maintained on the land or that trains should
stop and receive passengers and freight, with a right of re-
entry in the grantor upon breach of the condition.   When
actions of ejectment have been brought to enforce the for-
feiture upon breach of such condition they have invariably
been sustained.   (*Gray* v. *Chicago, Milwaukee and St. Paul
Railway Co.* 189 Ill. 400; *Lyman* v. *Suburban Railroad
Co.* 190 id. 320; *Latham* v. *Illinois Central Railroad Co.*
253 id. 93.)   In *Blanchard* v. *Detroit, Lansing and Lake
Michigan Railroad Co.* 31 Mich. 43, a conveyance was made
to the railroad company "upon the express condition that
said railroad company shall build, erect and maintain a de-
pot or station house on the land herein described, suitable
for the convenience of the public, and that at least one train
each way shall stop at such depot or station each day when
trains run on said road, and that freight and passengers
shall be regularly taken at such depot."   A bill was filed to
enforce the specific performance of these conditions, and
the defendant's answer insisted that the clause just quoted
was not a covenant but a condition subsequent, and that the
grantee having become satisfied that a compliance with it
would be detrimental to its interest and the public interest
had decided not to observe it and had not done so.   The
provision was held to be a condition subsequent and not
a covenant and its specific performance was denied.   The
court held the language to be plain and unambiguous; that
the terms were distinctly and plainly terms of condition;
that there was no room for construction, and that the par-
ties could not be heard to say, where there was no imposi-
tion, fraud or mistake, that although they deliberately made
a condition and nothing but a condition, they yet meant
that it should be exactly a covenant.   The court therefore
refused to decree a specific performance of the condition.

In *Close* v. *Burlington, Cedar Rapids and Northern
Railway Co.* 64 Iowa, 149, the conclusion was reached, up-
on a deed made upon a like consideration, that there was

no promissory undertaking to create a personal obligation on the part of the grantee.

In *Woodruff* v. *Trenton Water Power Co. supra,* the grantor brought suit for compensation and specific performance on account of the refusal of the defendant to maintain a raceway, bridge and fences in accordance with the terms of a conveyance of land containing the following provisions: "Subject, nevertheless, to the following proviso: 'That if the said main raceway shall not be made on said premises in conformity to the act incorporating said company the said lands and premises shall revert to the said George Woodruff, his heirs and assigns; and also that the said party of the second part shall erect, maintain and keep in good repair a safe, convenient and substantial bridge across said main raceway at a place to be designated by the said George Woodruff, and also cause to be made and kept in order a convenient landing place on the side next the River Delaware, so that wagons may at all times safely pass over thereon, and shall also erect and maintain all necessary fences across the said main raceway, together with fences across the said premises, * * * and shall also permit the said party of the first part to use the said raceway to give drink to his cattle and also to take ice therefrom to fill his icehouse.' " In holding that the suit could not be sustained the court said: "A condition is quite distinct from a covenant. The language in this deed is appropriate to create a condition, and, as if to avoid any doubt, the legal consequences of a breach or violation of the condition is inserted. Upon covenants, the legal responsibility of their non-fulfillment is that the party violating them must respond in damages. The consequence of the non-fulfillment of a condition is a forfeiture of the estate. The grantor may re-enter at his will and possess himself of his former estate. The grantees were to make the raceway in conformity to their act of incorporation; they were to erect, maintain and keep in good repair a safe and substantial bridge over the race-

way; they were to make a landing place on the River Delaware and to make and maintain the fences."

In *Mills* v. *Seattle and Montana Railway Co.* 10 Wash. 520, it was held that the grantor in a deed could not maintain an action against the grantee, the railway company, for damages for failing to maintain an irrigation ditch according to the supposed obligation of the deed contained in the words, " 'subject to the following conditions, which are made a part of the consideration of the foregoing transfer,' the condition being that the railway company would maintain an irrigation ditch."

In *Hale* v. *Finch,* 104 U. S. 261, Hale sold a steamboat to Finch and executed a bill of sale containing this provision: "And it is understood and agreed that the sale is upon this express condition: that said steamboat or vessel is not, within ten years from the first day of May, 1867, to be run upon any of the routes of travel on the rivers, bays or waters of the State of California or the Columbia river or its tributaries." The purchaser, in violation of this provision, caused the steamboat to be taken to San Francisco on October 1, 1868, and from that time to May 1, 1874, caused it to be run upon the routes of travel on the rivers, bays and waters of California, and the vendor brought a suit for damages against the purchaser for the violation of his alleged agreement. The court held that the language of the bill of sale did not imply an agreement that the purchaser would not use, or permit others to use, the boat or its machinery upon the prohibited waters within the period limited but only an agreement that the sale was on the express condition that the boat should not be so used, saying: "It is the case of a bare, naked condition, unaccompanied by words implying an agreement, engagement or promise by the vendee that he would personally perform or become personally responsible for its performance. The vendee took the property subject to the right which the law reserved to the vendor of recovering it upon breach of the condition

specified. The vendee was willing, as the words in their natural and ordinary sense indicate, to risk the loss of the steamboat when such breach occurred but not to incur the personal liability which would attach to a covenant or agreement upon his part that he would not use, and should not permit others to use, the boat or its machinery upon the waters and within the period named. If this be not so, then every condition in a deed or other instrument, however bald that instrument might be of language implying an agreement, could be turned, by mere construction and against the apparent intention of the parties, into a covenant or agreement involving personal responsibility."

In many of the cases cited, as in the present case, the grantors expected to receive benefits to their other property from the work to be done upon the land conveyed which would compensate them for the donation of their land. Here the appellee chose to insert in its deed a condition instead of a covenant. The evidence shows that the deed was passed back and forth, was carefully considered by both parties, and changes were proposed and assented to before it was executed and accepted. The terms of the instrument are unambiguous, its meaning clear, and there is no reason why the actual contract made by the parties should not be enforced. If the appellee has lost some part of the profit anticipated from the investment, it must be borne in mind that there is evidence which tends to show that the delay was caused by conditions which were not anticipated and could not be overcome except at what the appellant regarded as an excessive and unreasonable cost. It therefore permitted the time to elapse which constituted a breach of the condition of its deed, and the appellee thereby became entitled to a forfeiture of the estate and to re-possess itself of the land. For other breaches of condition which occurred afterward, if any, it had the same remedy, but it was entitled neither to specific performance in equity nor to damages at law. The decree of the circuit court was

therefore right so far as it found that the provisions of the deed in controversy were conditions subsequent and not covenants and that damages were not recoverable for their breach.

In bringing the action of ejectment the appellee recognized the provisions of the deed as conditions subsequent. There is no question of the breach of these conditions. The channel was not constructed through the appellee's property within two years after the date of the deed, the waters of the north branch of the Chicago river did not permanently pass through the channel within three years of the date of the deed, and all the material excavated on the appellee's land was not placed in the old channel and on the contiguous premises. The appellee was therefore entitled, in law, to declare a forfeiture of the estate granted by the deed and to maintain an action of ejectment for the possession of the land conveyed. The object of the appellant's bill was not to be relieved of a forfeiture incurred by a breach of conditions subsequent, but was to secure the benefit of the equitable defenses to the action of ejectment of waiver and equitable estoppel, to show that the failure to complete the channel within the prescribed time had been waived by the appellee, and that the failure to deposit all the excavated material on the appellee's land was with the consent of the appellee, who was therefore estopped to declare a forfeiture for such failure, and that for these reasons there was no forfeiture. Equity will sometimes relieve against the consequences of a breach of condition and save from forfeiture an estate which has vested and is in danger of being defeated by a failure to perform a condition subsequent, when the breach was not willful, the injury can be adequately compensated by damages and there is a certain rule by which to measure the damages. It is not necessary to discuss the principles on which equity relieves grantees from the hardship of forfeiture by substituting compensation. The appellant's bill is not based upon that doctrine. The

appellee had the right to waive the forfeiture and by its acts might estop itself from insisting upon a forfeiture. If it did so, no question of compensation remains to consider.

After the original contractors, finding that they were unable to complete the work with their equipment, had assigned their contract to the dredge and dock company, the long delay from October 5, 1904, to June 12, 1906, occurred, because during that time the dredge and dock company was occupied with the work on the lower part of the channel, through which access was obtained to the section of the channel involved here. It would have been physically possible, but much more expensive, to proceed with the work on the upper section without waiting for the lower section to be finished. The delay caused a breach of the condition which required the construction of the channel eighty feet wide and eight feet deep by July 22, 1905. When the work of excavation was resumed on June 12, 1906, this condition had already been violated, the estate forfeited and the appellee was entitled to re-enter and re-possess itself of the land conveyed. It did not do so, but on the contrary, with knowledge that the appellant was excavating the channel and filling up the old channel and the contiguous land at great expense, encouraged the appellant to proceed with the work regardless of the expiration of the limited time.

Wyllys W. Baird was a member of the managing committee of the Northwest Land Association and secretary of that committee from about June 22, 1899, until January, 1906, and continued as a member of the committee until January, 1909. During that time he had general supervision of the property of the association. The articles of the Northwest Land Association provided that no party to whom the property of the association shall be conveyed, nor any party dealing with the trustee or managing committee or its officers in relation to the trust property, shall be obliged to see to the application of the purchase money or to see that the terms are complied with, and the trustee, and

all others in dealing with the managing committee or any of its officers, shall not be obliged to inquire into their qualifications or authority, and, so far as third persons are concerned, all acts of the managing committee and of its officers and trustees shall be binding on the association. After the beginning of the work by the dredge and dock company Baird wrote a letter to the appellant calling attention to the fact that the deed to the appellant required the completion of the channel through the premises within two years after its date, saying: "You will observe that the time for completing this work has expired, and under the terms of the deed it lies within the power of the grantor of said deed to forfeit your right to the title of said land. We have no desire to deprive you of this right of way, but we do insist that the work be carried forward with greater expedition." Other letters were written referring to the manner in which the work was being carried on, and on November 20, 1906, Baird wrote, saying that since the large hydraulic dredge had taken the place of the smaller ones the work had not progressed so rapidly as before; that theretofore the dredge had been operated continuously day and night; that he was informed that this practice had been discontinued, and, as the demand for completing the work was as urgent as ever, he was at a loss to know why activities should be less keen. On December 13, 1906, he wrote that "I have kept in close touch with the work of your contractors and am free to say that since our conference they have apparently done everything in their power to expedite the work. It now looks as if they would reach the mouth of Wilson avenue sewer by the end of this week. This will relieve the most serious feature of their delay in getting through." On March 23, 1907, he wrote, saying: "In view of your flagrant violations of our contract with you we think it is no more than just that we insist that the channel between Wilson avenue and Lawrence avenue be completed without an hour's unnecessary delay." On April

278 — 35

12, 1907, the appellee notified the appellant that default had been made by the appellant in the performance of its covenants in failing to construct the new channel in accordance with the provisions of the deed within three years from its date and in other particulars, and that "unless you shall construct and complete said channel and shall cause the waters of the Chicago river to permanently pass through the same, in accordance with the terms and provisions of said deed, on or before the 1st day of July, 1907," the appellee will declare the estate conveyed by the deed to be forfeited and proceed to take possession of the property. On October 26, 1908, a letter to the appellant, signed on behalf of the Northwest Land Association by Louderback, its chairman, in regard to its claim against the appellant, setting forth various particulars, stated: "We now state in writing that under no circumstances would we attack the validity of our deed to the drainage board by its failure to fulfill its obligations on time or otherwise, as we recognize the work as one of great public benefit and necessity, and we rely on the fairness and good faith, alone, of yourself and your board in carrying out the obligations of your predecessors when you have fully investigated the facts as to the honesty of our claim."

This tract of land was valuable for subdivision, but provision for drainage was essential to its availability for such purpose. For several years the land association, through Baird, was negotiating with the city and the sanitary district, and the deed of the trust company to the sanitary district was the result of such negotiation. The condition as to the time of completion of the work was no doubt inserted to secure the construction of the work and the consequent drainage of the land at the earliest possible date. This provision was probably inserted as a condition rather than a covenant because the measure of damages for the breach of a covenant was uncertain and unsatisfactory and the condition was supposed to be more effective. The con-

dition was broken and the estate forfeited with nine-tenths of the work yet undone, and nearly a year afterward the sanitary district again began the work. The appellee did not merely stand by and let the work go on. It actively encouraged the appellant in proceeding with the work and expending a large amount of money in so doing and insisted that the work be carried forward with greater expedition, stating that it had no desire to deprive the appellant of the right of way though having the power to forfeit the title. This insistence upon expediting the work continued from time to time, making it perfectly apparent that however great might be the dissatisfaction with the delay there was no intention of forfeiting the title on account of it; that the desire was only to expedite the work. There was no indication of any intention to demand a forfeiture until April 12, 1907, and even the notice then served on the appellant by the appellee waived the then existing right to a forfeiture, merely stating that a forfeiture would be insisted on if the channel was not completed by July 1, 1907. A year and a half later, long after the work was completed, the land association, in its letter of October 26, 1908, deliberately stated that it would not, under any circumstances, attack the validity of the deed to the sanitary district by reason of the failure to fulfill its obligations on time or otherwise. A forfeiture once waived is, however, gone forever and cannot be revived by a change of mind of the party making the waiver or by subsequent events. "It is an elementary principle of law that it is not necessary, in any case, to prove the performance of a condition which has been waived by the party having the right to·demand its performance. A condition once waived is forever gone and the performance of it cannot be thereafter required." (*Continental Life Ins. Co.* v. *Rogers,* 119 Ill. 474; *Sharon Iron Co.* v. *City of Erie, supra.*) The making of partial payments to a contractor for the construction of a building after default in its completion within the time limited

by the contract and inducing the contractor to expend money in the completion of the building constitute a waiver of the owner's right to demand a forfeiture on account of the failure to complete the building within the time fixed. (*Eyster* v. *Parrott,* 83 Ill. 517; *Bloomington Hotel Co.* v. *Garthwait,* 227 id. 613.) The waiver of a forfeiture may be by parol even though the instrument is under seal, and where the grantor does any act inconsistent with his reliance upon the condition, his act amounts to a waiver of the condition so as to preclude him from afterward availing himself of the forfeiture. *Moses* v. *Loomis,* 156 Ill. 392; *Palmer* v. *Meriden Britannia Co.* 188 id. 508.

There had been no failure to deposit the excavated material on the appellee's land prior to the resumption of the work in June, 1906. The enlargement of the channel greatly increased the quantity of material to be excavated, and the method of excavation increased it still more. When the work was resumed with the hydraulic and dipper dredges a large quantity of the excavated material was placed upon scows, taken away and disposed of elsewhere than upon the appellee's land. Complaint is made of this action as a violation of the terms of the deed, and it was a breach of the condition. The appellant insists that the appellee is estopped to insist upon a forfeiture for this breach.

After the delivery of the deed to the sanitary district, in the fall of 1903, George N. Wisner, who was the chief engineer of the sanitary district, had charge of the work of preparing the plans and specifications for the contract for the excavation. He testified that he called upon Baird, as the representative of the owners of the land, and told him that it was necessary, before preparing the specifications, to find out how much filling the owners were going to require and where they wanted the property filled. Wisner had with him a map showing the channel as planned and contour lines showing the elevation of the land above Chicago city datum. Baird told him that he wanted all the

river filled and the low sloughs adjacent to it, and Wisner
told Baird that the contour lines of the map represented ele-
vations, and asked if he wanted all of the land filled there.
Baird said, "I don't want it all filled; I don't want any
more filled than is absolutely necessary to fill up the low
places and the old river, as I do not care to have the black
soil covered with clay coming from the excavation." He
then told Wisner he wanted it filled to about contour 11,—
that is, all the low ground next to the river that was below
contour 11. To Wisner's question what to do with the bal-
ance of the material, as he would have to specify it in his
specifications, Baird said, "That must be taken care of by
you people if there is any excess material." After the plans
and specifications were prepared Wisner again called on
Baird and showed them to him, and Baird told him that
the plans and specifications were satisfactory. As prepared,
the plans and specifications required the contractor to de-
posit on the appellee's land "sufficient material to fill the
same to plus 11 Chicago city datum," and that the con-
tractor should remove all surplus material remaining after
the land had been so filled. In regard to the conversations
with Wisner, Baird testified that his recollection of the first
conversation was of a very general nature and that he did
not remember any of the details, although the subject of
placing the filling to be taken out of the new channel in the
old river was undoubtedly discussed, but he had no recol-
lection of any reference to contour line 11 on the map, or
of anything said about filling the land up to the height of
eleven feet above city datum. At a subsequent conversa-
tion Wisner had a blue-print and a document he called spec-
ifications. Baird glanced through the specifications but not
sufficiently to see the details, and told Wisner that he did
not see that it concerned him or was anything he had to do
with but it was a matter for the engineer of the sanitary
district, and all he expected was that the contract should be
carried out. He thinks that Wisner indicated on the plat

where they proposed to place the filling and Baird told him that was satisfactory; that Baird wanted that area filled up good and full, and in doing so to avoid cutting or covering up any of the black soil, so far as practicable, and not to fill around the trees any more than necessary. He does not recollect that Wisner said it was proposed to limit the filling of that land to eleven feet, but as he recalled it the only thing said about it was that it was to be filled up good and full. As to any surplus material, he told Wisner that as far as he was concerned, after the land was filled up good and full he did not care what was done with the surplus. The specifications contained the provision already stated in regard to filling and the disposition of the surplus material, and these provisions were included in the contract as subsequently awarded. On September 28, 1906, Baird wrote a letter requesting the chief engineer of the sanitary district to send him copies of the district's survey, "indicating particularly the place where the filling is to be done as previously agreed upon; we have mislaid our copy." Baird testified that this expression in the letter referred to the map of the channel and to his conversation with Wisner.

The condition of appellee's deed requiring the placing of the excavated material in the old channel or upon the contiguous premises, as the owners of the contiguous premises might direct, it was necessary to provide in the contract for the excavation for the placing of such material. On account of the enlargement of the channel there would be a surplus of the excavated material to be disposed of, and it was with reference to this matter that Wisner went to see Baird. After their first conversation the specifications were prepared requiring the contractor to fill the land to eleven feet above Chicago datum and to remove all surplus material. When these specifications were submitted to Baird he was satisfied both with the amount of the filling and the disposition of the surplus. Afterward a contract was made on this basis, and that contract was performed

and the land filled to eleven feet above Chicago datum.
While the material was to be placed as directed by the own-
ers, the making of the contract with their assent amounted
to a direction, and after the appellant had entered into the
contract with such assent the appellee would be estopped to
insist upon some other disposition of the excavated mate-
rial to the damage of the appellant. Baird's recollection of
the conversation with Wisner is rather vague. He remem-
bers that he had a conversation with Wisner on the general
subject of the filling of the land but he does not remember
the details. The map with the contour lines was present
and was looked at, but he does not think the figures were
spoken of. The specifications also were there, which he
glanced over but not enough to see the details. In regard
to the surplus, he told Wisner that so far as he was con-
cerned, after the land was filled up good and full he did
not care what was done with the surplus. There is no posi-
tive denial of Wisner's testimony, and Baird admits that
in his letter of September 28, 1906, heretofore referred to,
the phrase "as previously agreed upon" refers to the con-
versation with Wisner and the map he then had. The spe-
cial occasion for showing this map to Baird and for the
conversation with him was to ascertain his views in regard
to the filling and the disposition of the surplus excavated
material, with a view to inserting them in the specifications.
The specifications were drawn providing for filling to eleven
feet above Chicago datum and the disposition of the sur-
plus material by the contractor, and afterward Baird re-
ferred to this map and conversation as an agreement indi-
cating particularly the place where the filling was to be done.
Baird was secretary of the managing committee of the land
association, whose articles of association provided that all
persons dealing with such officer should not be obliged to
inquire into his authority but that all of his acts should be
binding on the association. The preponderance of the evi-
dence shows that the agreement that the contractor should

fill the lands of the appellee contiguous to the old channel to plus 11 Chicago city datum and should remove all surplus material was made with the assent of the land association and that it was performed. The appellee is therefore estopped from complaining because all the excavated material was not placed upon its land.

Because of its waiver as to the time of completing the channel and of its estoppel to complain as to the disposal of the surplus excavated material the appellee cannot insist upon a forfeiture of the estate conveyed to the appellant, and it is entitled to no relief on its cross-bill.

The decree is reversed and the cause is remanded, with directions to dismiss the cross-bill and to render a decree perpetually enjoining the prosecution of the actions at law.

*Reversed and remanded, with directions.*

---

(No. 11301.—Reversed and remanded.)
FRED W. BRUMMEL *et al.* Appellees, *vs.* JACOB GLOS *et al.*—
(EMMA J. GLOS *et al.* Appellants.)

*Opinion filed April 19, 1917—Rehearing denied June 8, 1917.*